## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BUNTING GRAPHICS, INC., BUNTING, INC., BUNTING 5720, INC., and 712 GUM STREET, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>THE PHOENIX INSURANCE COMPANY,<br><br>    Defendant. | Civil Action No.<br>2:21-cv-254<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COME Plaintiffs, Bunting Graphics, Inc., Bunting, Inc., Bunting 5720, Inc., and 712 Gum Street, LLC (collectively "Plaintiffs"), by and through their undersigned attorneys, and for their Complaint against the above-named Defendant aver as follows:

### THE PARTIES

1. Plaintiff Bunting Graphics, Inc. is located at 20 River Road, Verona, Pennsylvania 15147, and is domiciled in the Commonwealth of Pennsylvania.

2. Plaintiff Bunting, Inc. is located at 20 River Road, Verona Pennsylvania 15147, and is domiciled in the Commonwealth of Pennsylvania.

3. Plaintiff Bunting 5720, Inc. is located at 20 River Road, Verona Pennsylvania 15147, and is domiciled in the Commonwealth of Pennsylvania.

4. Plaintiff 712 Gum Street, LLC, is located at 20 River Road, Verona Pennsylvania 15147, and is domiciled in the Commonwealth of Pennsylvania.

5. Defendant The Phoenix Insurance Company ("Defendant" or "Phoenix") is, on information and belief, domiciled in Hartford, CT and maintains a principal place of business located at One Tower Square, Hartford, CT 06183.

6. This Court has personal jurisdiction over Phoenix because it transacts substantial business within this judicial district including the transactions which are the subject matter of this lawsuit.

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391 since the events giving rise to this lawsuit occurred within this judicial district and since Phoenix is subject to personal jurisdiction in this district. Specifically, the insurance contract which is at issue here was entered into in Allegheny County and delivered in Allegheny County, the misrepresentations at issue here were made in Allegheny County, and the damaged property at issue here is located in Allegheny County.

8. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

## FACTS

9. Plaintiffs engineer, manufacture, and coat exterior building products. These products are coated with a specialty resin coating system.

10. On May 28th, 2019, Defendant Phoenix issued to Plaintiffs a policy of commercial insurance, numbered P-630-1D853977-PHX-19 (the "Policy"), a true and correct copy of which is attached hereto as Exhibit "1." The Policy period was from May 11th, 2019 to May 11th, 2020. The Policy covered, *inter alia*, the Plaintiffs' building, equipment, machinery, and business income from covered losses.

11. The Policy provided for, among other coverages, $18,169,982 in coverage for Plaintiffs' buildings and business personal property and $4,575,000 in deluxe business income and extra expense coverage.

12. On June 24th, 2019, Plaintiffs discovered that their paint line curing oven had caught fire at the facility located at 20 River Road, Verona, Pennsylvania 15147. This is a covered loss under the Policy.

13. On July 2nd, 2019, Plaintiffs reported the loss to Defendant. Defendant assigned claim number FDG7804 to the loss.

14. Also on July 2nd, 2019, Plaintiffs submitted a purchase order for replacement fan equipment to replace parts damaged by the fire.

15. The fan equipment was a specialty part that required a long lead time from order to delivery. Plaintiffs informed Defendant that the part would require time to arrive.

16. Instead of immediately performing an inspection of the site, Defendant elected instead to rely on pictures provided by Plaintiffs to evaluate the loss. Plaintiffs supplied these pictures on request.

17. Plaintiffs sent Defendant the requested pictures on July 10th, 2019, and supplied Defendant with Plaintiffs' chosen engineer's repair estimate on July 11th, 2019.

18. Plaintiffs did not hear again from Defendant regarding a site inspection.

19. By August 16th, 2019, 45 days after making the claim, Plaintiffs' business had reached a critical juncture and it became necessary to begin the repair process.

20. On August 19th, 2019, Plaintiffs reached out to Defendant and asked either for Defendant to inspect the damages or waive an inspection and allow Plaintiffs to proceed to repair the damaged machinery.

21. On August 19th, 2019, Defendant responded that Defendant agreed to the repairs and that it did not "need you to retain any of the damaged property as we have the photos that were provided," and that "we do not see any issues with moving forward with the [repair] proposal as presented." Defendant waived its rights to a site inspection. *See* Exhibit "2."

22. In reliance thereon, Plaintiffs hired the engineering firm that would perform the work and proceeded to begin ancillary work on the damaged equipment.

23. As early as August 30th, 2019, Plaintiffs submitted, through counsel, detailed evidence from third party accountants demonstrating that the anticipated business income loss would exceed the limits of insurance. This letter also communicated to Defendant the fact that additional delays in resuming operations past the then anticipated October resumption of activities would lead to additional lost business income and extra expense.

24. By September 13th, 2019, Plaintiffs had notified Defendant that, once the fan was received, Plaintiffs anticipated being up and running by mid-October, 2019.

25. On October 2nd, 2019, Plaintiffs received the fan equipment and notified Defendant of same and their intention to begin repairs.

26.     Also on October 2nd, 2019, Defendant internally estimated Plaintiffs' business interruption losses at $3,000,000 to $4,000,000.

27.     On October 4th, 2019, for the first time, Defendant insisted on a site visit, so as to further its efforts at developing its subrogation claims and thereby recoup monies paid to Plaintiffs during the course of Plaintiffs' claims.

28.     During meetings in advance of this site visit, Plaintiffs informed Defendant that the site visit would delay Plaintiffs' attempts to regain full operational capacity by at least an additional two weeks.

29.     For the first time during these meetings, Plaintiffs also learned from Defendant's subrogation team that Defendant wanted Plaintiffs to cease repair work for the investigation. Plaintiffs also learned that Defendant wanted Plaintiffs to preserve all parts of the oven and to make new replacement parts for the parts so removed, further complicating and lengthening the repair process.  Finally, Plaintiffs learned that Defendant anticipated removing certain control parts of Plaintiffs' damaged equipment to advance Defendant's subrogation claims, and thus these parts had to be replaced as well.  This was in direct contradiction to what Plaintiffs were told on August 19th, 2019, and on which they had relied.

30.     As a result of Defendant's delay in setting up the site inspection, Plaintiffs were forced to delay the start date of the restoration work on their equipment until October 21st, 2019.

31.     On October 14th, 2019, the site inspection of Plaintiffs' damaged equipment took place.  At the site inspection, the actions discussed during the pre-site visit meeting and outlined above were carried out.

32. During that site inspection, Plaintiffs again informed Defendant that the late site inspection, the investigation, the oven parts removal and new fabrication, and the control part removals should have occurred back in July when the claim was made, and that, as a result of the delay, Plaintiffs' business had been materially harmed.

33. On October 24th, 2019, Plaintiffs informed Defendant that the new scope of work the engineering contractor would be required to perform as a result of the additional work laid out at the site inspection would delay the restoration job until early December of 2019.

34. By October 30th, 2019, despite earlier projections by Defendant of the business loss of $3,000,000 to $4,000,000, Defendant had only paid $2,126,586.93 for the business income loss.

35. By November 5th, 2019, Defendant had reserved $4,575,000, the full policy limits, for Plaintiffs' business losses. It noted that "Travelers Claim Accounting Services (CAS) has estimated loss through 9/30/19 totaling $2,127,000 and has projected a likely loss through 12/31/19 totaling $3,379,000. The insured prepared and submitted a lost income claim through 10/31/19 totaling $3,873,000. Based on our current evaluation and the potential for loss to extend into the Extended Business Income coverage, we have reserved the policy limit for business income loss." *See* Exhibit "3."

36. Even as late as November 20th, 2019, delays in Defendant's provision and replacement of components removed or required to be replaced as a part of Defendant's subrogation inspections were still slowing the restoration work performed by Plaintiffs and their agents.

37. On or about December 12th, 2020, Defendant paid an additional $858,632.27 in business income coverage, for a total payment of $2,985,219.20. As of this date, the amounts paid by Defendant were less than Plaintiffs' estimate of losses through October 31st, and less even than Defendant's $3,379,000 loss estimates of November 5th for the time period through December 31st.

38. On January 22nd, 2020, Plaintiffs informed Defendant that their net income loss was in excess of $5,000,000 through November 2019, and that the damaged equipment was put back into operation on December 17th, 2019.

39. Also on January 22nd, 2020, Defendant informed Plaintiffs that they would be issuing additional funds from their calculations of the business income loss through November 30th, 2019. These funds would total an additional $469,561.91.

40. On or about March 26th, 2020, Defendant issued an additional payment for $118,494.03.

41. By April 9th, 2020, Defendant had paid $3,573,275.14 in lost business income and extra expense.

42. On April 29th, 2020, Defendant authorized an additional $199,536.70 in additional payments for business income interruption.

43. As of May 29th, 2020, Defendant had issued business income payments of $3,772,811.84, leaving $802,188.16 unpaid on the policy, despite the evaluation in early November of a policy limits claim.

44. As recounted above, Defendant unnecessarily delayed the site inspection and subsequently chose to schedule the inspection for its own benefit, to the detriment of the Plaintiffs and their business.

45. To this end, and despite waiving and relinquishing its right to inspect the damaged property via email on August 19th, 2019, Defendant later insisted on October 4th, 2019 to conduct the site visit. It insisted on the site visit to preserve evidence to strengthen its own claims in subrogation, even to Plaintiffs' detriment in the restoration timeline.

46. However, the lengthy delay from claim inception to inspection materially harmed Plaintiffs even as the inspection was conducted for Defendant's benefit. Defendants had evidence from Plaintiffs at least as early as August 30th, 2019 of the severity and amount of Plaintiffs' business income losses and had calculated the severity of the loss itself at between $3,000,000 to $4,000,000 by October 2nd, 2019.

47. Defendant thus knew, at least by August 30th, 2019, if not earlier, that it was facing a significant business interruption claim, but failed to arrange for a site visit of Plaintiffs' damaged property until October 14th, 2019, 104 days after first receiving notice of the claim. The inspection did not even occur until 12 days after Plaintiffs had received the part which required a lengthy time to order.

48. To compound the delay in arranging the site inspection, Defendant's actions in removing parts of Plaintiffs' controls to preserve as evidence for its subrogation claims and requiring fabrication of additional oven parts further delayed Plaintiffs' efforts to repair their machines and get back online.

49. As a result of Defendant's dilatory actions and conduct in preservation of its own subrogation claims, Plaintiffs' efforts to repair their machinery and become operational were delayed by more than two months, from early October 2019 until December 17th, 2019.

50. After the fact, Defendant utilized forensic accountants to justify its delay in order to claim that the delay could be compensated for by the payments it ultimately issued. Defendant did this by selectively analyzing Plaintiffs' books and records to manufacture the desired result and effect on Plaintiffs' businesses resulting from Defendant's more than two-month delay in restoration, while at the same time discounting the information provided by Plaintiffs and their accountants which contradicted Defendant's pre-ordained conclusions and outcomes.

51. Additionally, and despite knowing at least by August 30th, 2019, that Plaintiffs had suffered a significant loss, Defendant doled out payments on a delayed and piecemeal fashion, further damaging and hindering Plaintiffs' abilities to resume their business.

52. To date, Defendant has failed to pay policy limits on the claim, despite the fact that it knew, should have known, and/or recklessly disregarded the fact that Plaintiffs' losses exceeded policy limits.

53. Defendant's failure to pay policy limits and/or its decision to delay the timing of and/or underpay benefits also impacted and reduced Plaintiffs' retained earnings.

54. Plaintiffs' reduced retained earnings affected Plaintiffs' ability to demonstrate that Plaintiffs are a "going concern."

55. This failure to demonstrate that Plaintiffs are a going concern in turn impacted Plaintiffs' ability to meet their loan obligations, fulfill their customer contract agreements, satisfy their surety indemnity agreements, and obtain future payment and performance bonds.

56. These failures materially and substantially harmed Plaintiffs' businesses and contractual relations.

## COUNT 1 – BREACH OF CONTRACT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING

57. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth at length herein.

58. Defendant delayed and underpaid covered benefits due to Plaintiffs under the insurance contract alleged above.

59. After Plaintiffs made their claim for benefits under the Policy, Defendant breached the covenant of utmost good faith and fair dealing by, *inter alia*:

   a. Unnecessarily delaying the site inspection and expanding the scope of the repair work, which in turned delayed Plaintiffs' ability to repair their machine and restore operations;

   b. Putting Defendant's own subrogation interests ahead of the interests of Plaintiffs; and

   c. Delaying and underpaying benefits due under the policy when it knew or should have known that more benefits were due earlier.

60. As a direct and proximate result of Defendant's breach of contract, Plaintiffs suffered loss of coverage under the Policy to which they are contractually entitled and have suffered other damages.

61. As a direct and proximate result of Defendant's breach of the covenant of utmost good faith and fair dealing, Plaintiffs have suffered other damages.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant, and request the award of all known and/or foreseeable compensatory damages together with interest, as well as the award of consequential damages together with interest, and any such other relief as the Court deems just and proper.

### COUNT 2: BAD FAITH PURSUANT TO 42 Pa.C.S.A. § 8371

62. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth at length herein.

63. The actions and conduct of Defendant as averred in this Complaint constitute bad faith in violation of 42 Pa.C.S.A. § 8371.

64. Defendant forced Plaintiffs to hire counsel and file suit against it in order to obtain the benefits promised under the Policy.

65. Defendant knew of and/or recklessly disregarded its lack of a reasonable basis in denying, underpaying, and/or delaying Plaintiffs claims.

66. Defendant did not have a reasonable basis for denying, underpaying, and/or slow paying the benefits promised under the Policy, and knew and/or recklessly disregarded its lack of a reasonable basis in denying, underpaying, and/or slow paying the benefits promised under the Policy.

67. Defendant placed its own interests ahead of the Plaintiffs as Defendant's insureds, to the Plaintiffs' substantial detriment.

68. Defendant's above-described conduct constitutes bad faith in violation of Pennsylvania's bad faith statute, 42 Pa.C.S.A. § 8371.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant, and request an award of compensatory and punitive damages, interest, and attorney's fees and costs as permitted by law, together with any such other relief as the Court deems just and proper.

## COUNT 3: NEGLIGENT MISREPRESENTATION

69. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth at length herein.

70. Defendant represented to Plaintiffs in August of 2019 that only photographs would be necessary and no site visit would be required to adjust the claim and that Plaintiffs should proceed as normal with the restoration of their property.

71. Defendant communicated this information to Plaintiffs in a manner in which it knew or should have known that Plaintiffs would rely upon the same and take actions deleterious to their interests as set forth above.

72. Plaintiffs reasonably relied upon the representations made to them and thereafter took actions deleterious to their interests as set forth above.

73. Plaintiffs seek an award of damages for the direct and foreseeable losses set forth above.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant in an amount to be determined by the enlightened conscience of a jury, exclusive of interests and costs, together with any such other relief as the Court deems just and proper.

Respectfully submitted,

Date: February 22, 2021

By: _____
Edward I. Levicoff, Esquire
Pa. I.D. #200108
THE LEVICOFF LAW FIRM, P.C.
4 PPG Place, Suite 200
Pittsburgh, PA 15222
elevicoff@levicofflaw.com

*Attorneys for Plaintiffs*